**Richard VOGEL, Appellant,**

v.

**The CITY OF CINCINNATI,
et al., Appellees,**

**the Sentinel Police Association,
Intervenor–Appellee.**

**No. 91–3474.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1991.

Decided March 13, 1992.

---

William S. Wyler (argued), Donald B. Hordes, Donna M. Bergmann, and Schwartz, Manes & Ruby (briefed), Cincinnati, Ohio, for appellant Vogel.

Mark C. Vollman (argued), Fay D. Dupuis, City Solicitor, Julie F. Bissinger, Assistant City Solicitor, and Richard H. Castellini, City Solicitor's Office for the City of

Cincinatti (briefed), Cincinnati, Ohio, for appellees City of Cincinnati, Ohio, et al.

Alphonse A. Gerhardstein (argued) and Laufman, Rauh & Gerhardstein (briefed), Cincinnati, Ohio, for intervenor-appellee Sentinel Police Association.

Before: KEITH, RYAN and TIMBERS,[*] Circuit Judges.

TIMBERS, Circuit Judge.

Appellant Richard Vogel appeals from a summary judgment entered April 16, 1991, in the Southern District of Ohio, Carl B. Rubin, *District Judge,* in favor of appellees City of Cincinnati, et al., in an action commenced by Vogel to obtain damages resulting from the Cincinnati Police Division's affirmative action hiring policy.

The City adopted the affirmative hiring policy pursuant to a consent decree entered August 13, 1981. This settled an action commenced by the Department of Justice charging the City with engaging in hiring and promoting practices that discriminated against blacks and women.

On appeal, Vogel, a white male, contends that the City has gone beyond the scope of the consent decree in administering its affirmative action policy; or, in the alternative, that the City's affirmative action policy violates the equal protection clause of the Fourteenth Amendment.

We affirm.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

In 1980 the Department of Justice, on behalf of the United States, commenced an action against the City of Cincinnati, the Cincinnati Police Division and the Cincinnati Civil Service Commission (collectively, the City) alleging that they had engaged in hiring and promoting practices that discriminated against blacks and women in violation of Title VII. The Fraternal Order of Police, the collective bargaining representative of the police officers of Cincinna-

ti, intervened in the action. After extensive negotiations between all parties, a consent decree was entered August 13, 1981.

The consent decree provided that its purpose was to remedy any disadvantage to blacks and women that may have resulted from past discrimination so that equal employment opportunity would be provided for all. It established a long term goal of having the proportion of blacks and women in the sworn ranks of the Cincinnati Police Division approximate the proportion of qualified blacks and women in Cincinnati's work force. In order to reach that goal, the decree adopted as an interim goal the hiring of qualified black and female officers in at least the percentages that they represented in the 1980 recruit class (34% blacks, 23% women). These percentages resulted from the City's recent efforts to recruit more blacks and women for its police force. The consent decree specifically provided, however, that:

"nothing herein contained shall be interpreted as requiring the City defendants to hire unnecessary personnel, or to hire, transfer or promote a person who is less qualified over a person who is more qualified on the basis of properly validated employment selection devices within the meaning of the [Uniform Guidelines]."

Moreover, the decree provided that it would terminate upon a showing that its long term goal had been achieved.

In order to implement the decree, the City adopted a new procedure for hiring police recruits. Candidates initially are subjected to a medical examination, a psychological evaluation, a physical ability test, and a background investigation. Candidates then are given a written examination which has been validated to determine minimum qualifications for police recruits. Those candidates achieving a score of at least 60% on the examination are placed on the Open Eligible List. When selecting from the Open Eligible List, the City accords preference to qualified blacks and women as necessary to meet, if possible,

---

[*] The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

the interim goal established by the consent decree of having recruit classes that are 34% black and 23% women.

As a result of this affirmative action policy administered by the Cincinnati Police Department pursuant to the consent decree, Vogel was not selected as a member of the recruit class that began training in October 1989. Although he was appointed to a recruit class within several months thereafter, he commenced this action against the City seeking back pay, retroactive seniority and other benefits for the period that he was denied a position with the police force due to the hiring policy of the City.

In support of his claim Vogel contends that the City has gone beyond the terms of the consent decree by implementing what is essentially a quota system, i.e. taking a predetermined percentage of blacks and women into each recruit class. Specifically, he contends that the City's policy is not in accord with that part of the decree which provides that "nothing herein shall be interpreted as requiring the City to hire unnecessary personnel ... or a person less qualified over a person who is more qualified on the basis of properly validated employment selection devices...." Vogel contends that, since the City's policy resulted in the City hiring candidates with lower written examination scores than his, the City violated the consent decree. In the alternative, Vogel contends that, if in fact the Police Department's hiring policy is authorized by the consent decree, then the consent decree violates the equal protection clause of the Fourteenth Amendment.

Oral argument in the instant case took place in our Court on November 5, 1991. On November 21, the Civil Rights Act of 1991 (1991 Act or the Act) was enacted. As a preliminary matter, therefore, we must address whether the 1991 Act is to be applied retroactively to the instant case. We hold that the 1991 Act does not govern the instant case which involves conduct that occurred before the 1991 Act became law. We therefore shall not attempt to interpret the substantive provisions of the 1991 Act; rather, we shall apply the law that was in effect prior to the 1991 Act.

We hold that Vogel, who was not a party to the consent decree, lacks standing to challenge the City's interpretation of the decree. Moreover, we hold that, although Vogel does have standing to challenge the constitutionality of the City's policy pursuant to the decree, the affirmative action policy adopted by the City pursuant to the consent decree does not violate the equal protection clause of the Fourteenth Amendment.

We affirm the summary judgment of the district court dismissing Vogel's claim against the City.

## II.

The Supreme Court has not yet settled the question of whether, absent clear legislative intent, a congressional enactment should be applied retroactively or prospectively. In *Bradley v. Richmond School Board,* 416 U.S. 696 (1974), the Court articulated the proposition that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711. In its more recent decision in *Bowen v. Georgetown University Hospital,* 488 U.S. 204 (1988), however, the Court reiterated the longstanding principle that "[r]etroactivity is not favored in the law.... [and] congressional enactments ... will not be construed to have retroactive effect unless their language requires this result." *Id.* at 208. In *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827 (1990), the Court recognized this "apparent tension" in its precedents, *id.* at 837, but it did not settle the issue since in *Kaiser* there was clear evidence of congressional intent; and "where congressional intent is clear, it governs." *Id.*

The 1991 Act, on its face, does not make clear whether it should be applied retroactively or prospectively. Section 402 of the Act states that "[e]xcept as otherwise specifically provided, this Act and the Amendments made by this Act shall take effect

upon enactment." This language could be construed to mean either that the Act should be applied to any charge or case pending on or after the date of enactment, or that it should be applied only to conduct occurring after that date. The legislative history does not provide any guidance on this question. Senators expressed conflicting views. For example, Senator Danforth stated that the Act was to apply prospectively only, 137 Cong.Rec. S15,483 (daily ed. Oct. 30, 1991), whereas Senator Kennedy expressed disagreement with that view. *Id.*

District courts construing the Act have split on the issue of whether it should be applied retroactively or prospectively. *Compare Van Meter v. Barr,* 778 F.Supp. 83 (D.D.C.1991) (refusing to apply damages provision of the 1991 Civil Rights Act retroactively) *with Mojica v. Gannett Co.,* 779 F.Supp. 94 (N.D.Ill.1991) (applying the Act retroactively to allow recovery of damages pursuant to the Act).

■ In response to the uncertainty generated by the failure of Congress to specify whether the Act should be applied retroactively or prospectively, the Equal Employment Opportunity Commission, on December 27, 1991 issued a policy statement that it "will not seek damages under the Civil Rights Act of 1991 for events occurring before November 21, 1991." Generally, absent clear legislative intent, the construction given a statute by the agency that administers it is entitled to deference, provided it is reasonable. *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843–44 (1984). In light of the ambiguity of the statute on its face and the lack of congressional guidance, the EEOC's decision to apply the 1991 Act prospectively appears reasonable.

■ This is consistent with our recent decision in *United States v. Murphy,* 937 F.2d 1032 (6th Cir.1991), where we had to decide whether, absent clear legislative intent, a provision of the False Claims Act should apply retroactively or prospectively. We stated that the choice was "between the broad statement of the law in *Bradley* and the recent affirmation in *Bowen* of the

general rule against retrospective application." *Id.* at 1037. While recognizing that we frequently have cited *Bradley* as controlling, we nevertheless held that *Bradley* should be read narrowly and should not be applied in contexts where "substantive rights and liabilities", broadly construed, would be affected. *Id.* at 1037–38. Clearly, retroactive application of the 1991 Act would affect "substantive rights and liabilities" of the parties to this action.

We hold that the 1991 Act does not apply retroactively to Vogel's claim for damages resulting from the hiring policy the City's police department adopted pursuant to the consent decree. We therefore apply the law that was in effect prior to enactment of the 1991 Act.

### III.

#### (A)

■ A consent decree, although in effect a final judgment, is a contract founded on the agreement of the parties. *Long v. City of Saginaw,* 911 F.2d 1192, 1201 n. 5 (6th Cir.1990); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 484 (6th Cir. 1985); *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983). It should be construed to preserve the position for which the parties bargained. *Williams, supra,* 720 F.2d at 920. A consent decree "is not enforceable directly or in collateral proceedings by those who are not parties to it...." *Blue Chips Stamps v. Manor Drug Stores,* 421 U.S. 723, 750 (1975). It "may be challenged only on the ground that its substantive provisions unlawfully infringe upon the rights of the complainant." *Vanguards of Cleveland, supra,* 753 F.2d at 484.

■ In contending that the City has gone beyond the scope of the consent decree in administering its affirmative hiring policy, Vogel, who was not a party to the consent decree, seeks collaterally to enforce it according to his own interpretation of it.

We hold that Vogel lacks standing to assert such a claim.

### (B)

■ Vogel, however, also contends that the City's affirmative action policy pursuant to the decree violates the equal protection clause of the Fourteenth Amendment. In this respect, the initial hurdle for Vogel is the standing requirement of Article III. "To have standing, a party must be aggrieved by the judicial action from which it appeals." *Vanguards of Cleveland, supra,* 753 F.2d at 484. Regardless of how moderate a preference the decree accords women and minorities, if there is some detriment to the party challenging the decree, that party has sufficient standing to challenge the decree. *Id.* Moreover, in the recent case of *Martin v. Wilks,* 490 U.S. 755 (1989), the Court adhered to the general rule that a party cannot be deprived of rights at a proceeding to which he is not a party. *Id.* at 762. The Court held in *Martin* that people who are not made a party to a consent decree have standing to commence an action challenging the constitutionality of the decree as it is applied to them.

Since Vogel was denied employment with the Cincinnati Police Department for a period of several months as a result of the affirmative action policy adopted by the City pursuant to the consent decree, and since Vogel was not a party to the consent decree, we hold that he has standing to challenge the constitutionality of the decree as it is applied to him.

### IV.

We traditionally have reviewed affirmative action plans to determine whether they are reasonably related to the objective of remedying prior discrimination and whether the plans are fair and reasonable to non-minorities who may be affected by them. *Vanguards, supra,* 753 F.2d at 484.

Here, the plan adopted by the City pursuant to the consent decree does not require the discharge of non-minority workers, and "although initial employment opportunities coupled with hiring goals may burden some innocent individuals, they do not impose the same type of intrusive injuries that layoffs, which result in loss of job expectancy, se-

curity, and seniority, involve." *Long, supra,* 911 F.2d at 1196–97 (citing *Wygant v. Jackson Board of Ed.,* 476 U.S. 267, 283 (1986)). Neither does the plan adopted by the City present a complete bar to non-minorities. *Vanguards, supra,* 753 F.2d at 484. Moreover, the plan requires the hiring only of *qualified* blacks and women; it does not require the selection of unqualified blacks or women over qualified white males. The hiring policy the Cincinnati Police Division adopted pursuant to the consent decree therefore is a fair and reasonable policy of affirmative action.

■ The Supreme Court, however, has begun subjecting race-conscious affirmative action plans to strict scrutiny. Any racial classification must be justified by a compelling state interest, *Wygant, supra,* 476 U.S. at 274 (plurality opinion); *Palmore v. Sidoti,* 466 U.S. 429, 432 (1984), and the means chosen by the state must be narrowly tailored to achieve that goal. *Wygant, supra,* 476 U.S. at 274; *Fullilove v. Klutznick,* 448 U.S. 448, 480 (1980) (plurality opinion). The level of scrutiny does not change merely because the challenged classification works against a group that historically has not been subject to governmental discrimination. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494 (1989) (plurality opinion); *Wygant, supra,* 476 U.S. at 273; *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724 n. 9 (1982).

■ For the City's affirmative action policy to pass muster pursuant to this strict scrutiny standard, the City must have " 'a strong basis in evidence for its conclusion that remedial action was necessary.' " *Long, supra,* 911 F.2d at 1196 (quoting *Wygant, supra,* 476 U.S. at 277). "[A]n amorphous claim that there has been past discrimination in a particular industry ..." does not suffice. *Croson, supra,* 488 U.S. at 499. Evidence of wide statistical disparities, however, may justify an affirmative action policy adopted by a public employer. *Wygant, supra,* 476 U.S. at 274–75 (citing *Hazelwood School District v. United States,* 433 U.S. 299, 307–08 (1977)). Here,

the proper statistical comparison is between the race and gender of the Cincinnati Police Division and the race and gender of the Cincinnati Police Division and the race and gender of the relevant qualified labor market. *Croson, supra,* 488 U.S. at 501–02; *Wygant, supra,* 476 U.S. at 275; *Hazelwood, supra,* 433 U.S. at 308,.

In the instant case, the City's affirmative action policy with respect to women is clearly justified. In the past the City had limited women to ten positions with the CPD; required more education of female than male applicants for entry level positions with the CPD; prevented women from achieving a rank above that of police specialist; and assigned women exclusively to the juvenile division of the CPD. As of July 1980, only 3.4% of the sworn force of the Cincinnati Police Department were women while women constituted 22.8% of the applicants for the force during the period from 1974 to February 1980.

With respect to blacks, the City's affirmative action hiring policy is justified, in part, by statistics which show that, between 1972 and 1979, 33.7% of the applicants for entry level police officer positions were black, whereas only 20.4% of the appointments were black. Moreover, in 1980 only 9.9% of the sworn officers in the Police Department were black while the labor force of the City was 24% black. The City's statistical expert, Vivian Toler, analyzed these statistics according to the binomial approximation model adopted by the Supreme Court in *Castaneda v. Partida,* 430 U.S. 482, 496–97 n. 17 (1977) and *Hazelwood, supra,* 433 U.S. at 308–09 n. 14. Under this model, which involves a "calculation of the 'standard deviation' as a measure of predicted fluctuations from the expected value of a sample ... [a] 'difference between the expected value and the observed number [that] is greater than two or three standard deviations,'" would allow an inference that race had played a role in the City's hiring policies. *Hazelwood, supra,* 433 U.S. at 309 n. 14 (quoting *Castaneda, supra,* 430 U.S. at 497 n. 17). Here, the disparity between the expected rate of black appointments and the actual rate was 4.7 standard deviations. The disparity between the expected and actual numbers of blacks on the Cincinnati police force was 12.5 standard deviations.

Vogel points to no statistics that would cast doubt on the validity of the statistics relied upon by the City. Instead, relying on *Croson, supra,* 488 U.S. 469 he contends only that the City's statistics are not relevant because they fail adequately to consider the percentages of *qualified* women and minorities. Indeed, "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *Id.* at 501–02 (citing *Hazelwood, supra,* 433 U.S. at 308). As the Court stated in *Croson,* "[f]or low minority membership ... to be relevant, the city would have to link it up to the number of local [minority businesses] eligible for membership." *Id.* at 503,.

Unlike *Croson,* where the City of Richmond had adopted an affirmative action plan based on a finding of discrimination in the construction industry in general, Cincinnati's plan was based on statistics indicating that it had discriminated in hiring its own police force. *Accord Cone Corp. v. Hillsborough County,* 908 F.2d 908, 915 (11th Cir.1990). Moreover, the City did not rely on statistical comparisons with the general workforce of the City of Cincinnati. Rather, the City compared the composition of its police force with the applicant pool from which it was selected. *Cf. Long v. City of Saginaw, supra,* 911 F.2d at 1202 ("[I]t is only when the statistics disclose the availability of *minorities in the relevant labor pool* substantially exceeded those hired that an inference of deliberate discrimination in employment may be drawn." (emphasis added)). Moreover, the City considered the fact that in 1980, following substantial efforts to increase the numbers of blacks and women on the police force, *qualified* blacks and women constituted, respectively, 34% and 23% of the class of recruits. The City thus "linked up" the low percentages of blacks and women on its police force with the eligible pool of applicants.

We hold that the City had "a strong basis in evidence for its conclusion that remedial action was necessary," *Wygant, supra,* 476 U.S. at 277, and was justified in adopting the affirmative action hiring policy for its police force.

## V.

To summarize:

Vogel, who was not a party to the consent decree, lacked standing to challenge collaterally the City's interpretation of the decree. He had standing, however, to challenge the constitutionality, as applied to him, of the policy the City adopted pursuant to the consent decree.

We hold that the hiring policy adopted by the City pursuant to the consent decree does not violate the equal protection clause of the Fourteenth Amendment. It serves to eradicate the present effects of the City's prior discriminatory hiring practices, and it is narrowly tailored to achieve that purpose.

*Affirmed.*

RYAN, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's conclusion that Richard Vogel is without standing to contest the validity of the 1981 consent judgment and has suffered no deprivation of any right under the Fourteenth Amendment of the United States Constitution as a result of Cincinnati's affirmative action hiring policy. I also concur, therefore, in the court's judgment of affirmance.

I decline, however, to join the court's holding that the Civil Rights Act of 1991, 42 U.S.C. § 1981, "does not apply retroactively to Vogel's claim for damages resulting from the hiring policy the City's Police Division adopted pursuant to the consent decree." The basis for the court's ruling does not rest upon any consideration peculiar to Vogel's claim, but rather upon a more universally applicable analysis of the statute's retroactivity under general principles of statutory construction.

It may be that the court is correct in its conclusion that the Act is not retroactively applicable to Vogel's claims, but the issue of the retroactivity of the Act in general, or, if retroactive, its applicability to this case in particular, has not been raised, briefed, or fully argued by the parties.

I would not pass upon that very significant question without full briefing and proper submission of the issue.