Douglas PUCKETT

v.

CITY OF LOUISVILLE, City of Louisville Civil Service Board, City of Louisville Police Department, Louisville Fraternal Order of Police, Louisville Black Police Officers.

No. C90–0856–L(A).

United States District Court, W.D. Kentucky, at Louisville.

June 10, 1992.

Teddy B. Gordon, Louisville, KY, for plaintiff.

David Leighty, Cecil A. Blye, Jr., Paul V. Guagliardo, Winston E. King, City Law Dept., Louisville, KY, for City of Louisville and Louisville Police Dept.

Mark W. Dobbins, Tilford, Dobbins, Alexander and Buckaway, Louisville, KY, for Louisville Civil Service Bd.

Paul Soreff, Allison, Soreff & Garber, Louisville, KY, Julius L. Chambers, Clyde E. Murphy, New York City, for Louisville Black Police Officers.

## MEMORANDUM OPINION

ALLEN, Senior District Judge.

This case presents the claim of plaintiff Douglas Puckett, a white police officer, that he was the victim of unlawful racial discrimination in 1985 and 1986 when he was denied promotions granted to black officers with lower examination scores than his. Defendants City of Louisville ("City"), Louisville Civil Service Board ("Board"), and Louisville Black Police Officers Organization ("BPOA") have brought the matter before the Court on motions for summary judgment.

The parties agree concerning most of the facts. Puckett ranked tenth on a list of sixteen eligible candidates for lieutenant during the time in question. During this time, ten lieutenant vacancies were filled, each from a group of three referrals from the list of eligibles. Due to the requirements of a consent decree in effect at the time, referrals were race-conscious, and referral groups alternated between black eligibles and white eligibles. On three of the ten occasions for promotion to lieutenant, the referral group was black. Puckett was not referred for promotion before the eligibility list expired.

There is no dispute that the referral procedure the Board followed was required by the court-approved consent decree in *Louisville Black Police Officers Association et al. v.*

*City of Louisville, et al.,* C74–0106–L(A) (September 22, 1980). There is also no dispute that if the referral procedure followed before and after the time of effectiveness of that consent decree had been employed, Puckett would have been referred for promotion. Consequently, the case squarely presents the question of the extent to which compliance with that consent decree shields the City and the Board from claims of race discrimination. Puckett has not attempted to offer any material indicating that the consent decree was not justified by a compelling state interest. Rather, he contends only that he has been denied his rights because his examination scores were higher than those of the black sergeants who received promotions to lieutenant.

■ Defendants note that the Supremacy Clause of the United States Constitution required the City to honor the federal court decree. Defendants also contend that this action is barred by the doctrine of collateral estoppel, citing in support of their argument *Detroit Police Officers Ass'n v. Young,* 824 F.2d 512, 516 (6th Cir.1987), in which the Court held that a plaintiff could be collaterally estopped where there was a showing of a "strong community of interests" with a party to a previous suit in which the issue was litigated [citing *Bronson v. Board of Education,* 525 F.2d 344, 349 (6th Cir.1975)]. Accordingly, we must examine the positions of the relevant parties in the *LBPOA v. City* litigation, in order to determine whether the necessary "strong community of interests" exists.

The complaint was filed in C74–0106 in March 1974. In November of 1975, before certification of the plaintiff classes, the Fraternal Order of Police, Louisville Lodge # 6, and its president, Sergeant W. Thomas Denton, moved to intervene as defendants. The Court granted intervention with full party status on December 2, 1975. The intervening answer included the following statement:

4. That as an affirmative defense, the intervening defendants herein plead that the relief sought by the plaintiffs in this action would have the effect of creating discrimination in reverse in that there would cause to be made a disproportionate

number of black officers as opposed to white officers without taking into proper consideration the qualities, the expertise, education and abilities of the applications and/or those officers seeking promotion to higher rank, and that said discrimination as described herein would be contrary to the rights of the intervening defendants as secured by the Fourteenth Amendment to the Constitution of the United States and Title 42 U.S.C., Sections 1981 and 1983.

Puckett's claim is almost identical. That is, Puckett claims here that the relief received by the plaintiffs as a result of the previous action had the effect of creating discrimination in reverse, contrary to his rights. We are of the opinion that this shows an extremely strong community of interests between Puckett in this action and the FOP in C74–0106.

Puckett argues that *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) puts to rest such a collateral estoppel argument and guarantees him his day in court because he was not party to *LBPOA v. City*. In *Wilks*, white firefighters claimed that their rights were violated because the governmental units were making race-conscious promotion decisions in conformity with consent decrees entered a previous suit to which the white firefighters were not party. The agreed dispositions in the prior suit had been reached after bench trial on some issues but before judgment. After the district court provisionally approved the decrees, the Birmingham Firefighters Association ("BFA") appeared for the first time at the fairness hearing and filed objections as *amicus curiae*. After the hearing, the BFA and two of its members moved to intervene, but the motion was denied as untimely.

While we are compelled to agree that Puckett is not collaterally estopped from presenting his complaint, we believe the present situation differs significantly from *Martin v. Wilks*. First, C74–0106 included an explicit judicial determination that the City had engaged in unconstitutional intentional discrimination against black applicants. The prior litigation discussed in *Wilks* included no such determination, consent agreements being en-

tered into prior to any judgment. *Id.* at 759, 109 S.Ct. at 2183.

Second, the Birmingham Firefighters Association (counterpart to the FOP in our situation) was *not* a party to the prior litigation discussed in *Wilks*. Indeed, that organization responded to the notice of the proposed settlement by filing objections as *amicus curiae*, but did not even attempt to intervene until after the fairness hearing. As noted above, the FOP was a participating party in C74–0106 for the five years prior to the entry of the consent decree. The FOP participated fully in the Stage One discovery and trial proceedings that resulted in the Court's finding of discrimination. As this Court stated in a June 19, 1989 opinion:

> The original remedy was part of a process that involved the adversary procedure, careful examination of evidence, participation by intervenors, and multiple opportunities for input from those not named as parties to the action.

Furthermore, the FOP was not only a party to the lawsuit in *LBPOA v. City*, but a party to the intensive negotiations assisted by the Federal Mediation Service, and a party to the consent decree itself. On May 2, 1980, all parties, including the FOP, moved the Court "to consider the objections of the intervenor FOP [and] to schedule a hearing for the purpose of determining whether the proposed consent decree is fair, adequate, reasonable and should be approved by the Court." The Consent Decree tendered with this motion makes specific reference to the parties, including the FOP, and their extensive litigation, discovery and negotiation.

Finally, the FOP was not simply in a position in which it *could* have raised the challenges Puckett offers here; the FOP, acting as a party, *did* specifically challenge the provisions that resulted in Puckett's not being referred for promotion. In a lengthy September 22, 1980 opinion, the Court addressed these objections directly, discussing the enduring discrimination that justified the remedy and rejecting the objections for stated reasons.

■ For all the above, it remains true that Puckett himself was not a party to C74–0106.

Accordingly, this case differs from *Detroit Police Officers Ass'n v. Young, supra,* in which the plaintiff was a member of a class certified in the prior suit. While the circumstances set out above concerning the extensive participation of the FOP in C74–0106 may not establish collateral estoppel, they are quite relevant in demonstrating the opportunities in the previous suit for development of evidence—pro and con—concerning the necessity for the affirmative action policy.

On that issue, Puckett's challenge here must fail. In *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992), an initially unsuccessful applicant for police department employment claimed that the affirmative action policy of the department violated his constitutional rights. As was true in C74–0106, the Fraternal Order of Police intervened in the prior Cincinnati action and participated in the negotiations that produced a consent decree upon which the police department later based their actions with respect to Vogel.

The Sixth Circuit held that Vogel had no standing to challenge the City's interpretation of the prior consent decree, but he did have standing to challenge the constitutionality of the decree as it was applied to him, and the Court proceeded to determine whether the affirmative action policy derived from the consent decree was justified by a compelling state interest. In determining that it was so justified, such that Vogel's challenge must fail, the Sixth Circuit reiterated that a valid affirmative action policy must have "a strong basis in evidence," citing *Long v. City of Saginaw,* 911 F.2d 1192, 1196 (6th Cir.1990). The justification may come from "[e]vidence of wide statistical disparities." *Vogel* at 599, citing *Wygant v. Jackson Board of Ed.,* 476 U.S. 267, 274–75, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986).

The consent decrees in C74–0106 were designed to remedy a pervasive racial discrimination that was amply supported by extensive evidence, much of it statistical (and demonstrating wide disparities[1]), and much of it based on step-by-step analysis of the selection criteria (including the written examinations) used by the police department for hiring and promotion. The five week trial in C74–0106 focused on hiring procedures alone; however, the analytical framework established by the Court's findings were used by all parties to analyze the sources of discrimination in promotion and discipline as well.

Although Puckett has utilized his opportunity to conduct discovery, and although the issue of the propriety of the challenged policy was clearly raised by defendants' motions for summary judgment, Puckett has offered nothing to meet the strong evidence that the challenged remedial action was necessary. As there is no dispute of fact concerning this issue, we believe the defendants are entitled to judgment as a matter of law.

An order in conformity has this day entered.

### SUMMARY JUDGMENT

This matter having come before the Court on defendants' motions for summary judgment, and the Court having entered its memorandum opinion and being fully advised,

IT IS ORDERED AND ADJUDGED that the defendants' motions for summary judgment are granted.

This is a final and appealable order and there is no just cause for delay.

---

1. For example, the challenged consent decree, of record herein, indicates that the applicant pool was 15% black; the goal of the first year of the affirmative action policy was to *raise* the percentage of black lieutenants on the force to 2.4%.