991 F.2d 796
 62 Fair Empl.Prac.Cas. (BNA) 1056
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Douglas PUCKETT, Plaintiff-Appellant,
v.
CITY OF LOUISVILLE, Louisville Civil Service Board,
Louisville Police Department, Louisville Fraternal
Order of Police, Louisville Black Police
Officers Association,
Defendants-Appellees.
 No. 92-5869.
 United States Court of Appeals, Sixth Circuit.
 March 31, 1993.
 
 Before MILBURN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an employment discrimination case brought by a white police officer who was denied an opportunity to be considered for promotion because of a court-ordered affirmative action plan. Although the officer was not a party to the lawsuit in which the plan was approved by the court, he was represented by a collective bargaining agent that was a party. The threshold issue presented here is whether the plaintiff officer's claim was barred by collateral estoppel. Concluding that the claim was so barred, we shall affirm the judgment entered by the district court in favor of the defendants.
 
 
 2
 * In October of 1984 the Civil Service Board of Louisville, Kentucky, issued a 16-person list of Louisville police sergeants who were eligible for promotion to the position of police lieutenant. Plaintiff Douglas Puckett was ranked tenth on the list. The rankings were determined by the candidates' scores on two examinations and by their length of service as sergeants. Only four black officers were on the list; they ranked thirteenth through sixteenth.
 
 
 3
 During the time the list was effective, ten lieutenant positions became vacant. Ten promotions were made from the list. Each of the individuals selected for promotion was chosen by the chief of police from three candidates referred to him by the Civil Service Board. Pursuant to an affirmative action plan embodied in a consent decree, the board referred the highest ranking blacks on the list in connnection with three of the vacancies. As a result, the seventh, eighth, and ninth officers on the list were the last white officers referred to the chief of police as candidates for promotion. Sgt. Puckett was never referred for consideration, while black officers who ranked lower than he did on the list of eligibles were referred and were promoted.
 
 
 4
 The consent decree was entered in a class action brought against the city and others in 1974 by individual black police officers and the Louisville Black Police Officers Organization. The Louisville Fraternal Order of Police ("FOP"), the collective bargaining representative for Louisville police officers, was permitted to intervene as a party defendant in 1975.[1] Following a trial on certain of the plaintiffs' claims, the district court found that blacks had been significantly underrepresented in the police department and that the city had violated Title VII of the Civil Rights Act of 1964. See Louisville Black Police Officers Organization v. City of Louisville, 511 F.Supp. 825 (W.D.Ky.1979). The parties then reached a settlement of all outstanding claims, and the settlement was embodied in a consent decree entered on September 22, 1980--almost five years after the FOP became a party to the action.
 
 
 5
 With respect to vacancies at the lieutenant level, the consent decree specified that the board would alternately refer groups of three white applicants and three black applicants to the chief of police until the number of black lieutenants met prescribed percentages. But for this requirement, Sgt. Puckett would have been among those whose names were referred to the chief as candidates for promotion.
 
 
 6
 Sgt. Puckett sued the City of Louisville and the Civil Service Board in state court, alleging race discrimination in violation of the Kentucky Civil Rights Act. The city removed the case to the United States District Court for the Western District of Kentucky pursuant to 28 U.S.C. § 1443(2). The Louisville Black Police Officers Association and the Louisville FOP were subsequently joined as new parties defendant. The district court ultimately granted summary judgment to all defendants on the ground that Sgt. Puckett could not show that the remedy granted in the earlier class action had been improper. 819 F.Supp. 589. This appeal followed.
 
 II
 
 7
 If Sgt. Puckett had personally participated in the class action as a party, there can be no question that the doctrine of collateral estoppel would bar him from challenging the class action decree in a subsequent lawsuit. See Detroit Police Officers Assn. v. Young, 824 F.2d 512 (6th Cir.1987), where we listed four criteria that govern application of the doctrine:
 
 
 8
 "(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
 
 
 9
 (2) determination of the issue must have been necessary to the outcome of the prior proceeding;
 
 
 10
 (3) the prior proceeding must have resulted in a final judgment on the merits; and
 
 
 11
 (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." Id. at 515 (footnote citations omitted).
 
 
 12
 The issue raised in the present case is the lawfulness of the race-conscious system through which, as required by the consent decree entered in the class action, Louisville currently selects candidates for promotion to the position of police lieutenant. That issue turns on whether the Louisville Police Department discriminated against black officers in the past, and if so, whether the remedy chosen in the earlier lawsuit was a necessary one. See Vogel v. City of Cincinnati, 959 F.2d 594, 599 (6th Cir.), cert. denied, 121 L.Ed. 49 (1992). Both questions were raised in the earlier case, and they were litigated at trial and in a post-trial "fairness hearing" that resulted in approval of the consent decree. Determination of these precise questions was necessary to the outcome of the prior proceeding, and the consent decree constitutes a final judgment on the merits.
 
 
 13
 The FOP had a full and fair opportunity to litigate the dispositive issue in the prior proceeding. From the very beginning of its participation in the litigation, the FOP took the position that the kind of relief ultimately granted in the consent decree was unlawful. The answer filed by the FOP in the class action had this to say on the subject:
 
 
 14
 "[T]he relief sought by the plaintiffs in this action would have the effect of creating discrimination in reverse in that there would cause to be made a disproportionate number of black officers as opposed to white officers without taking into proper consideration the qualities, the expertise, education and abilities of the applications and/or those officers seeking promotion to higher rank, and that said discrimination as described herein would be contrary to the rights of the intervening defendants as secured by the Fourteenth Amendment to the Constitution of the United States and Title 42 U.S.C., Sections 1981 and 1983."
 
 
 15
 Noting that Sgt. Puckett's claim is almost identical, the district court found "an extremely strong community of interest between Puckett in this action and the FOP in [the class action]." This finding is strengthened by the facts that the FOP participated fully in the class action discovery proceedings and trial; that the FOP was a party to the negotiations that culminated in the consent decree; that the FOP specifically challenged the provisions that later resulted in Sgt. Puckett not being referred to the chief of police as a candidate for promotion; and that the FOP joined in a motion asking the court "to consider the objection of the ... FOP [and] to schedule a hearing for the purpose of determining whether the proposed consent decree is fair, adequate, reasonable and should be approved by the Court."
 
 
 16
 The doctrine of collateral estoppel applies not only to the parties to a lawsuit, of course, but to their privies as well. For reasons that are not entirely clear to us, the district court felt compelled to conclude that Sgt. Puckett did not stand in a position of privity with the FOP, and thus was not collaterally estopped from presenting his complaint. But if the interests of the FOP and Sgt. Puckett were sufficiently similar--if there was a community of interest between them that was sufficiently strong, in other words--the doctrine of collateral estoppel would bar Sgt. Puckett's claim even though he was not himself a party to the class action. See Detroit Police Officers Assn., 824 F.2d at 516.
 
 
 17
 There is nothing to the contrary in Vogel, where plaintiff Vogel was denied employment with the defendant city's police force as a result of an affirmative action policy mandated by a consent decree in a case to which a police union was a party, and Mr. Vogel was held to have standing to challenge the constitutionality of the decree as applied to him. It does not appear that the police union in Vogel represented individuals who were applying for jobs in the first instance. Unlike Sgt. Puckett in the case at bar, moreover, Mr. Vogel contended that the defendant city had gone beyond the terms of the consent decree. (We held, somewhat surprisingly, that Vogel lacked standing to make this contention. Vogel, 959 F.2d at 598.)
 
 
 18
 Sgt. Puckett argues that the FOP could not adequately represent his interests in the class action because the FOP is not, and should not be, a "race conscious" organization. Sgt. Puckett goes on to say, at page 6 of his brief, that
 
 
 19
 "The interests of the Black police officers were protected by a race conscious and race specific organization, the Black Police Officers Association. For the Court to determine that the interests of the White officers were adequately protected by a racially neutral organization which had to work for all officers regardless of race, working in an adversary process with an organization which was race specific and which had racially motivated goals representing Black officers is clearly erroneous."
 
 
 20
 We do not find this argument persuasive. The reality of the situation is that the membership of the FOP was largely white. It is true that the organization did not advocate a promotion policy designed to give preference to white candidates on account of their race, but a majority of the membership was presumably satisfied with the colorblind promotion policy that the FOP did advocate. That is the policy advocated by Sgt. Puckett himself, of course, and we see no reason to suppose that the FOP fought for this position any less vigorously than Sgt. Puckett would have done had he appeared in person.
 
 
 21
 The fact that the FOP had a racially integrated membership hardly suggests to us that the organization could not effectively and sincerely advocate the racially neutral promotion policy favored by Sgt. Puckett. We are not prepared to engage in the sort of racial stereotyping under which it could be presumed that every black member of the FOP supported the kind of affirmative action policy embodied in the consent decree. African-Americans are not monolithic in their views on such matters. Many are strongly in favor of affirmative action, of course, but others are ambivalent (see, e.g., Stephen L. Carter's book, Reflections of an Affirmative Action Baby ), and still others (the newspaper columnist Walter Williams, for example) are strongly opposed. See, in this connection, Thomas Sowell, " 'Affirmative Action': A Worldwide Disaster," Commentary, Vol. 88, No. 6, December 1989, at 21; see also Shelby Steele, The Content of Our Character: A New Vision of Race in America (1990).
 
 
 22
 It remains to be considered, finally, whether Martin v. Wilks, 490 U.S. 755 (1989), precludes application of the doctrine of collateral estoppel here. The facts in Martin v. Wilks bore some resemblance to those presented in the case at bar, but there the labor union (a firefighters association) that corresponded to the Louisville FOP was nothing more than amicus curiae in the original proceeding wherein consent decrees had been issued. Unlike the Louisville FOP, the firefighters association was not actually a party to the original proceeding, and the Wilks plaintiffs, unlike plaintiff Puckett, were not privies to the consent decrees. The issue presented to the Supreme Court in Martin v. Wilks was whether the plaintiffs' collateral attack on the consent decrees was impermissible because the plaintiffs had failed to intervene in the initial proceeding notwithstanding their knowledge of its pendency. Rejecting the "impermissible collateral attack" doctrine espoused by several courts of appeals, the Supreme Court held that the plaintiffs' failure to intervene was not fatal to their case. The attribution of preclusive effect to a failure to intervene was inconsistent with the Federal Rules of Civil Procedure, the Supreme Court concluded, noting that "[j]oinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are ... bound by a judgment or decree." 490 U.S. at 765.
 
 
 23
 In the case at bar, of course, no one contends that Sgt. Puckett is bound by the consent decree because he failed to intervene. He is bound by the consent decree, rather, because his labor union did intervene, as his representative, and because it litigated the issue that he now wishes to relitigate. Nothing in Martin v. Wilks requires us to allow Sgt. Puckett to revisit the issue that was resolved against his representative in the earlier case.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Sgt. Puckett was then and is now a dues paying member of the FOP