## Amalia PASCUAL, et al.

v.

## ANCHOR ADVANCED PRODUCTS, INC.

### No. CIV–2–91–362.

United States District Court,
E.D. Tennessee,
at Greeneville.

April 30, 1993.

Michael Cary Murphy, Morristown, TN, for plaintiffs.

William R. Seale, Jeffrey C. Taylor, Wimberly & Lawson, Morristown, TN, for defendant.

## ORDER

HULL, District Judge.

This Title VII action is before the Court to consider motions for summary judgment filed by the defendant. After careful consideration of the record as a whole, the Court makes the following findings of fact and conclusions of law:

## PLAINTIFFS' PROPOSED FINDING OF FACT ADOPTED BY THE COURT

1. Employees Amalia Pascual, Gloria Helton and Jane Brown were long term employees of the defendant, Anchor Advanced Products, Incorporated, and received satisfactory job performance reviews and raises during their employment which ended on May 24, 1990.

2. The defendant employed an investigator who issued an investigative report which outlined drinking on behalf of employee Jesse Waller, a black male, as well as other allegations.

3. The Tennessee Department of Employment Security, found after a hearing and due process that the plaintiffs were not guilty of any misconduct connected with their employment.

## DEFENDANT'S PROPOSED FINDINGS OF FACT ADOPTED BY THE COURT

1. Plaintiffs, Amy Pascual, Gloria Helton and Jane Brown were employed by Anchor Advanced Products, Inc. (hereinafter referred to as "Anchor") at its Davis Street facility in Morristown, Tennessee. Plaintiffs, Pascual and Helton were employed as machine operators and plaintiff Brown was a quality control inspector. The plaintiffs all worked in the packaging department. The plaintiffs were each discharged from their employment with Anchor on May 24, 1990.

2. Plaintiff Pascual is a female of Philippine origin. Plaintiff Helton is of United States origin, white, and female. Plaintiff Brown is of United States origin, black, and female.

3. While plaintiffs were employed with Anchor, a number of employees approached Diane West, Human Relations Manager, and made verbal complaints about employee conduct including sexual harassment and other offensive behavior. The complaining employees advised West that the stated offensive behavior was creating an uncomfortable work environment.

4. As a result of employee complaints, Anchor investigated the employee conduct on second shift. Anchor placed two (2) undercover agents in the plant. Additionally, on May 23, 1990, Anchor interviewed over twenty (20) employees. During these interviews the employees were questioned about their behavior during working hours as well as their observance of others.

5. Present at the May 23, 1990 employee interview were West and Bob Wolfe, Production Superintendent, along with two agents from the investigative agency.

6. While plaintiffs were employed with Anchor, Anchor had Plant Guidelines in effect setting forth a guide as to the nature of conduct that would not be tolerated.

7. Anchor's Plant Guidelines, "B." and "H.", provide as follows:

### Plant Guidelines

We try to make this a safe and pleasant place to work. The cooperation of all employees is necessary to carry this out. People who work together realize that one person's misconduct may harm all the rest, and they expect certain standards of conduct to be set.

It would be impractical to set forth a list of all activities that are considered improper, illegal, or contrary to good business practices and good employee-employer relations. This list is intended only as a guideline.

It is emphasized, however, that any act (whether on this list or not), which in the judgment of management is not consistent with this policy, shall be grounds for disciplinary action, up to and including termination of employment.

The following activities are violations of company guidelines and rules.

. . . .

B. Committing an act considered improper or immoral conduct, or any act of violence, such as fighting, on the company premises.

. . . .

H. Willful violation or disregard of safety, health, fire, security, or employment regulations, signs and notices.

8. Plaintiffs, Pascual, Helton and Brown, each received a copy of Anchor's Plant

Guidelines in January, 1990, and signed receipt thereof.

9. The term "melvin" is defined as the act of an individual coming up from behind another individual and reaching down into their pants, grabbing hold of their underwear and pulling it up and out over their pants.

10. On May 24, 1990, plaintiffs Pascual, Helton and Brown, each met with Diane West and were discharged for violating Plant Guidelines "B." and "H.".

11. The decision to discharge the plaintiffs and the other three employees on May 24, 1990, was made by Joseph M. Viglione, Senior Vice President of Human Relations and Total Quality, West, Bob Wolfe, and Terry Jones, plant manager.

12. Three other employees admitted to giving melvins and were discharged on May 24, 1990 for violations of Plant Guidelines "B." and "H.". Those three employees were Eddie Wilmeth, white, male; Mark Lowery, white, male; and Lynn Musick, white, female. All three are of United States National origin.

13. During plaintiff Brown's May 23, 1990 interview, she advised Ms. West and the others present that during working hours she had observed co-employees, Eddie Wilmeth, Mark Lowery, Lynn Musick, plaintiffs Helton and Pascual, each give melvins.

14. Other than plaintiffs Pascual and Helton, and the other three employees terminated on May 24, 1990, no other employee at Anchor admitted to giving melvins, or being involved in behavior of similar severity.

15. Anchor has an Employee Assistance Program (EAP"), wherein it assists employees who come forward and present Anchor with a substance abuse problem. Employees who come forward with a substance abuse dependency are considered to have a medical problem, and are dealt with in the same manner as any other employee with a medical problem.

16. On May 24, 1990, employee Jesse Waller confided in Anchor regarding having an alcohol problem. Pursuant to Anchor's policies, Waller was placed in the EAP.

17. Employees Jesse Waller and Jeff Shortridge did not admit to giving melvins or to being involved in behavior of that nature.

18. On November 4, 1991, plaintiffs filed a complaint alleging they were discharged from Anchor because of their race, sex and national origin (plaintiff Pascual), in violating of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.*, and state civil rights statutes. On November 22, 1991, the plaintiffs amended their complaint alleging Anchor's discriminatory acts violated the Civil Rights Act of 1991.

19. Plaintiff Brown testified that two male employees, Mark Lowery and Eddie Wilmeth, were discharged for the same reasons she was.

20. Plaintiff Brown testified that four white employees, Lynn Musick, Gloria Helton, Mark Lowery and Eddie Wilmeth, were discharged for the same reasons and at the same time that she was.

21. Plaintiff Brown bases her race and sex discrimination claim on the contention that she was discharged while Jesse Waller (black male) and Jeff Shortridge (white male) were not.

22. Plaintiff Brown does not allege that Waller ever gave a melvin or participated in behavior of that nature. Plaintiff Brown claims that Waller smelled of alcohol at times and that his supervisor was aware of his alcohol problem. Waller's alcohol problem is the only basis for her sex discrimination claim in regard to him.

23. Plaintiff Brown does not claim that Jeff Shortridge ever gave a melvin or participated in like behavior. Plaintiff Brown bases her sex and race discrimination claims in regard to Shortridge on the contention that he was aware of the activities taking place in the plant which led to the plaintiff's and the other three discharges.

24. On May 23, 1990, plaintiff Helton provided Anchor with a written statement, signed, admitting that she had given co-employee, Mark Lowery melvins on different occasions.

25. Plaintiff testified that she was told she was being discharged because of her

conduct. She further testified that plaintiffs Brown and Pascual, along with Mark Lowery, Lynn Musick, and Eddie Wilmeth, were also discharged because of their conduct at the same time she was.

26. Plaintiff Helton testified that she was not aware of any employee who was involved in melvin activities who was not discharged.

27. Plaintiff Helton bases her sex discrimination claim solely on the contention that she was discharged and Jesse Waller and Jeff Shortridge were not.

28. Plaintiff Helton bases her race discrimination claim solely on the contention that Jesse Waller was not discharged and she was.

29. Plaintiff Helton testified in her deposition that she never saw either Waller or Shortridge ever touch another employee, or participate in melvin activity.

30. Plaintiff Helton bases her discrimination claim in regard to Shortridge on the contention that he should have been discharged because he was aware of the existence of the employee conduct which led to the plaintiffs' discharges.

31. Plaintiff Helton bases her discrimination claims in regard to Waller on the assertion that she had heard that he had a drinking problem. Plaintiff Helton admitted that she had never smelled alcohol on Waller and had never seen him drinking alcohol at work.

32. Plaintiff Pascual testified that two male employees, Mark Lowery and Eddie Wilmeth were discharged at the same time and for the same reasons she was.

33. Plaintiff Pascual testified that co-employee Lynn Musick (white female), was discharged for giving melvins. Plaintiff Pascual stated that Musick was discharged for the same reasons she was.

34. Plaintiff Pascual admitted that she had unzipped a male co-employee, Jesse Waller's, pants during working hours. Plaintiff Pascual claims she was "pushed" into unzipping Jesse Waller's pants.

35. Plaintiff Pascual bases her sex discrimination claim on the contention that Jesse Waller and Jeff Shortridge were not discharged at the time she was.

36. Plaintiff Pascual bases her race and national origin discrimination claim on the assertion that Carmen Mills (black female), Pam Brown (white female), and "Cecilia" (white female), were not discharged when she was.

37. Plaintiff Pascual did not ever see Jesse Waller or Jeff Shortridge given anyone a melvin or participate in behavior of that nature.

38. Plaintiff Pascual bases her sex discrimination claim in regard to Waller stating that he had a drinking problem and should have been discharged. Plaintiff Pascual never saw Waller drinking alcohol.

39. Plaintiff Pascual bases her sex discrimination claim in regard to Shortridge on the allegation that he should have been discharged because he saw employees stealing toothbrushes and horseplaying and did not say anything about such conduct.

40. Plaintiff Pascual bases her race and national origin discrimination claim in regard to "Cecilia" on the assertion that she participated in horseplay at work.

41. Plaintiff Pascual bases her race and national origin discrimination claim in regard to Pam Brown on the allegation that she put her hands inside of a male employee's pants.

42. Plaintiff Pascual bases her race and national origin discrimination claim in regard to Carmen Mills on the assertion that she was the victim of a melvin.

COURT'S ADDITIONAL FINDINGS OF FACT

1. During a May 23, 1990 interview, six employees were accused of giving "melvin" to other employees at Anchor while on the plant floor during working hours. The six employees who were accused of giving melvins were: (1) Plaintiff Brown, black, female; (2) Plaintiff Helton, white, female; (3) Plaintiff Pascual, Filipino, female; (4) Lynn Musick, white, female; (5) Eddie Wilmeth, white, male; (6) Mark Lowery, white, male.

2. Although plaintiff Brown admitted that she had involuntarily received a "melvin," she denies ever giving a "melvin."

3. Although Diane West testified that plaintiff Brown admitted giving a "melvin," this is not reflected in this plaintiff's written statement, and is not supported by the testimony of any witness who named individuals who were observed giving "melvins."

4. Diane West testified that she did not keep a listing of all employees that received "melvins"; however, she did keep a listing of those employees who gave "melvins."

5. Although plaintiff Pascual named other individuals who allegedly engaged in sexual horseplay, she did not report these individuals to the defendant. Plaintiffs Brown and Helton did not name any individuals who had given "melvins" who were not fired.

## CONCLUSIONS OF LAW

■ 1. In regard to plaintiff Brown, there is a material dispute of fact in regard to whether or not she gave a "melvin," or only received a "melvin" on one occasion. It is undisputed that those employees who only received "melvins" were not recorded on a list and were not disciplined, because the defendant was only concerned with those individuals who gave "melvins." Therefore, if plaintiff Brown only received a "melvin," she was singled out to be disciplined when others who were similarly situated were not.

Accordingly, it is hereby **ORDERED** that the defendant's motion for summary judgment in regard to the plaintiff Brown is **DENIED.** [Doc. 31].

2. In regard to plaintiff Helton and plaintiff Pascual, both plaintiffs admitted that they engaged in sexual horseplay. Although plaintiff Pascual denies that she gave a "melvin," plaintiff Brown testified that Pascual did give "melvins," and in any event, Pascual admits that she unzipped a male employee's trousers on two occasions. During her deposition and in her written statement given to the defendant, plaintiff Helton admitted to giving "melvins" and attempting to give "melvins."

■ As a basis for their claims of sexual and racial discrimination, and with Pascual's claim of national origin discrimination, the plaintiffs point out that a black male employee was retained even though he admitted drinking on the job, and that a white male supervisor was retained even though he allegedly knew that employees were stealing toothbrushes. However, the plaintiffs ignore the undisputed fact that two white male employees were also fired for sexual horseplay and "melvins." The Court finds that the two white male employees fired for giving "melvins" were similarly situated to plaintiffs Pascual and Helton, but that the black male employee and the white supervisor are not similarly situated.

■ To establish a *prima facie* case of racial discrimination, the plaintiffs must show that other employees who are similarly situated, but not member of a protected class, were not subject to the adverse action complained of. *Galbraith v. Northern Telecom, Inc.*, 944 F.2d 275, 281 (6th Cir.1991), citing *Shah v. General Electric Co.*, 816 F.2d 264, 270 (6th Cir.1987). The Sixth Circuit has clearly held that different treatment does not constitute disparate treatment absent evidence of disparate handling of a similarly situated co-worker. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 69 (6th Cir. 1985).

Therefore, the Court finds that plaintiffs Pascual and Helton have failed to establish a *prima facie* case by a preponderance of the evidence, because similarly situated employees who were not members of a protected class were fired for the same conduct as these plaintiffs. Accordingly, it is hereby **ORDERED** that the defendant's motions for summary judgment in regard to plaintiffs Pascual and Helton are **GRANTED,** [Docs. 29 and 30], and that their case is **DISMISSED.**

## DAMAGES ISSUE TO BE TRIED IN REGARD TO PLAINTIFF BROWN

■ Pursuant to this Court's order, the parties have briefed the issue of whether or not damages for embarrassment, emotional distress, and humiliation are recoverable in this complaint which predates the effective date of the 1991 Civil Rights Act. In view of the Sixth Circuit's holding in *Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir.1992), which holds that this act is not retroactive, the Court finds that these damages are not recoverable, and it is **ORDERED** that plain-

tiff Brown's claim for these damages as well as her claim for punitive damages is **DISMISSED.** Although plaintiff Brown also claims back pay, front pay, overtime, bonuses, fringe benefits, insurance, pension benefits, Social Security, seniority, and interest, she has failed to file an itemized list of specific amounts claimed pursuant to this Court's order.

Accordingly, plaintiff Brown will have ten (10) days from the date hereof to file a list of damages listing specific amounts, less any wages earned to the date of trial.