Glenda **JOHNS**, Plaintiff,

v.

**EVERGREEN PRESBYTERIAN MINISTRIES, INC.,** Defendant.

**Civ. A. No. 6:93cv135.**

United States District Court, E.D. Texas, Tyler Division.

July 16, 1993.

ROBERT M. PARKER, Chief Judge.

## Memorandum Opinion and Order

Before the Court are: Evergreen Presbyterian Ministries, Inc.'s Motion for Summary Judgment; and Plaintiff's Response to Defendant's Motion for Summary Judgment.

Upon careful consideration, the Court has reached the conclusion that Defendant's Motion for Summary Judgment should be GRANTED IN PART and that this case should be STAYED PENDING THE UNITED STATES SUPREME COURT'S DECISION IN *LANDGRAF v. USI FILM PRODUCTS*, 968 F.2d 427 (5th Cir.1992).

### I. Introduction

■ The "effective date" of the 1991 Civil Rights Act was November 21, 1991. Plaintiff filed her Original Complaint in this case on February 2, 1993, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, as amended by the 1991 Civil Rights Act (the Act). Defendant argues that it is the date of alleged *conduct* that triggers the "effective date" of the damages and jury trial provisions of the 1991 Civil Rights Act in a particular case, and not the date of complaint filing. Specifically, Defendant argues that allowing Plaintiff to proceed under the damages and jury trial provisions of the Act, even in this proceeding filed after the date of the Act's passage, would constitute an impermissible "retroactive" application of the Act because all of the defendant's alleged unlawful, intentional race discrimination *conduct* took place *before* the "effective date" of the Act.

For the reasons discussed below, the interests of justice, judicial economy and plain prudence compel the Court to stay this case until the Supreme Court renders its ruling in *Landgraf*. This Court is actually of the opinion that the defendant's argument is wrong, *but for* apparent Fifth Circuit law that may well soon be overruled, or at least distinguished from filed-after-the-Act cases such as this, by the United States Supreme Court next Term in *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992).[1]

William S. Hommel, Jr., Smithson & Hommel, Tyler, TX, for plaintiff.

Charles Homer Clark, Law Offices of Charles H. Clark, Tyler, TX, for defendant.

1. The question presented to the Supreme Court in *Landgraf* is whether Section 102 of the Act

## II. Defendant's 1991 Civil Rights Act (Section 102) Retroactivity Argument

Section 102 of the Act reflects a couple of significant changes to Title VII:

### Sec. 102 Damages in Cases of Intentional Discrimination.

\*    \*    \*    \*    \*    \*

**(a) Right of Recovery.—**

**(1) Civil rights.**—In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–5) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e–2 or 2000e–3), and provided that the complaining party cannot recover under section 1977 of the Revised Statutes (42 U.S.C.1981), the complaining party may recover *compensatory and punitive damages as allowed in subsection (b)*, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

**(b) Compensatory and Punitive Damages.—**

\*    \*    \*    \*    \*    \*

\*    \*    \*    \*    \*    \*

\*    \*    \*    \*    \*    \*

\*    \*    \*    \*    \*    \*

**(c) Jury Trial.**—*If a complaining party seeks compensatory or punitive damages under this section—*

*(1) any party may demand a trial by jury;* and

*(2)* the court shall not inform the jury of the [damage amount] limitations described in subsection (b)(3).

(emphasis added) In short: under the Civil Rights Act of 1991 (provided the complaining party cannot recover under 42 U.S.C. § 1981), victims of unlawful intentional discrimination are granted entitlement to "a jury trial, at which they may recover compensatory damages for 'future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses,' as well as punitive damages." *United States v. Burke,* —— U.S. ——, —— n. 12, 112 S.Ct. 1867, 1874 n. 12, 119 L.Ed.2d 34 (1992) (Blackmun, J.) (citing Pub.L. No. 102–166, 105 Stat. 1073).

It is not at all clear that applying these provisions of the Act to Plaintiff's case would constitute a "retroactive" application of the Act. *See generally Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 857–858 n. 3, 110 S.Ct. 1570, 1587–88 n. 3, 108 L.Ed.2d 842 (Scalia, J. concurring) (noting that even under a purely prospective application of a statute it is not always clear when a statute should be applied to parties because whether or not the statute should apply "depends upon what one considers to be the determinative event by which retroactivity or prospectivity is to be calculated."). Unlike the appeal of Ms. Landgraf, this case was not "pending" at the time the Act became effective; it was not even *filed* until after the Act's "effective date" of November 21, 1991. However, as will be explained next, *even assuming* application of Section 102 of the 1991 Civil Rights Act to this case *would* constitute a retroactive application of the

---

applies to cases *pending* (at least, those pending on appeal) when the Act became law—so as to entitle Petitioner Landgraf full, Act amended-Title VII redress. The district court (this one) applied the Title VII law as it then existed and found Ms. Landgraf was indeed the victim of sexual harassment in violation of Title VII. The Fifth Circuit on appeal appears to have held that the jury trial and compensatory and punitive damages provisions of the Act do not apply "retroactively" to *conduct* occurring before the "effective date" of the Act—given the lack of clear congressional intent on the issue and the "manifest injustice" that would inhere: (1) from upsetting a case that was properly tried by the district

court under the procedures applicable at the time, or (2) from charging an employer with "anticipating" the "seachange" in employer *liability* effected by the compensatory and punitive damages provisions of the Act. *See* 61 U.S.L.W. 3557, 3558 (Supreme Court Proceedings, Summary of Orders, Feb. 23, 1993).

The Supreme Court has also granted *certiorari* in a Sixth Circuit case presenting the question of whether Act amendments apply to *42 U.S.C. § 1981* cases pending (at least, those pending on appeal) at the time the Act took "effect." *Harvis v. Roadway Express Inc.,* 973 F.2d 490 (6th Cir. 1992) (below). *See* 61 U.S.L.W., *supra,* at 3558.

provisions therein to Defendant, this application appears permissible (again, *but for* the Fifth Circuit's apparently broad language to the contrary in *Landgraf*).

### A. Language of the Act

■ It is rudimentary that "the starting point for interpretation of a statute 'is the language of the statute itself.'" *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). Section 402(a) of the Act states as a general matter: *"[e]xcept as otherwise specifically provided,* this Act and the Amendments made by this Act *shall take effect upon enactment."* Pub.L. No. 102–166, 105 Stat. 1073, § 402(a). And the Act *explicitly forecloses* retroactivity in two situations: (1) cases involving discrimination by United States companies against United States citizens living abroad (Pub.L. No. 102–166, 105 Stat. 1073, § 109(c)); and (2) certain disparate impact cases (Pub.L. No. 102–166, 105 Stat. 1073, § 402(b)).

Under the terms of the Act as a whole, the inclusion of language explicitly prohibiting retroactivity in two provisions might seem to imply (in order to avoid statutory redundancy) the general retroactivity of the Act (*i.e.,* the retroactivity of the rest of the Act). *See Davis v. City and County of San Francisco,* 976 F.2d 1536, 1551–1553 (9th Cir.1992) ("Where Congress intended that certain sections of the Act should not be applied retroactively, it made specific pronouncements as to those. We will not render those pronouncements a nullity by holding that the rest of the Act is likewise to have no retroactive effect.") (citing *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988) (Scalia, J. plurality opinion), *inter alia,* for the Supreme Court's "repeatedly declared," "cardinal rule" of statutory interpretation—that no provision should be construed as to be entirely redundant). *See also Estate of Reynolds v. Martin,* 985 F.2d 470, 473 (9th Cir.1993) ("[t]he potential ambiguity of the phrase 'take effect upon enactment' disappears when construed *in pari materia* with the qualifying clause of

section 402(a), and with sections 402(b) and 109(c)."); *Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302, 1304 (N.D.Cal.1992) (same). However, the Fifth Circuit has rejected this thesis. *Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1372–1374 (5th Cir.1992) (specifically rejecting this reasoning as "rest[ing] too much on negative implication," and stating: "We are faced with a deliberately ambiguous statute, and we are asked to resolve political questions Congress was not able to answer."), *Pet. for Cert. filed,* 61 U.S.L.W. 3356 (Sept. 29, 1992) (Supreme Court Docket No. 92–737).

### B. Legislative History

The second place to look for guidance relative to an appropriate statutory construction, legislative history, is likewise unenlightening as to the Act's retroactivity. While the 1991 Act—generally recognized as a product of the war of attrition between Congress and the President—speaks *ambiguously* on the question of retroactivity, the pronouncements of individual members of Congress, while anything but ambiguous, are nonetheless hopelessly *disharmonious. See Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1372–1374 (5th Cir.1992).

### C. The EEOC's Policy Statement(s)

The Equal Employment Opportunity Commission (EEOC) is responsible for administering Title VII. The EEOC issued a policy statement, dated December 27, 1991, announcing it would "not seek damages under the Civil Rights Act of 1991 for *events* occurring before November 21, 1991." EEOC Notice No. 915.002 (Dec. 27, 1991), Daily L.Rep. (BNA No. 1 at D–1 (January 2, 1992)) (emphasis added).

■ Generally, in the absence of clear statutory language or legislative intent on a specific question, courts defer to a *reasonable* construction of a statute by the agency designated to administer the statute. As the Supreme Court held in *Chevron U.S.A. Inc. v. Natural Resources Defense Counsel,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), if a court

determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own con-

struction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

However, it is far from clear that the EEOC's issuance of guidelines for EEOC enforcement of the 1991 Civil Rights Act's Title VII amendments is entitled to this, *Chevron* level of judicial deference. As recently as 1991, the Supreme Court reaffirmed a 1976 decision (*General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (Rehnquist, J.)) in which the Supreme Court confirmed that when an agency like the EEOC is not empowered by Congress to promulgate rules or regulations on a statute it is charged with administering, courts should accord less weight to the agency's interpretation of that statute. *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, ——, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991) (Rehnquist, C.J.) (holding in particular that Title VII does not apply extraterritorially to regulate employment practices of United States employers who employ United States citizens abroad; Title VII's broad jurisdictional language, its "alien exemption" clause, and the position of the EEOC that Title VII applied abroad all fell short of demonstrating affirmative · congressional intent as required to overcome a presumption against the extraterritorial effect of legislation—particularly in light of evidence that Congress was aware of the need to make a clear statement that legislation applies overseas in order to make it so applicable).

In *Gilbert,* the Court stated that in evaluating the contention that EEOC guidelines are entitled to "great deference:" "it should first be noted that Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." 429 U.S. at 140–141, 97 S.Ct. at 410. And in *Arabian American Oil Co.,* despite the vociferous criticisms launched by four Justices, the Court unambiguously solidified this EEOC exception to the general, *Chevron* rule of deference to agency interpretations. Wrote the Chief Justice:

In … *Gilbert* …, we addressed the proper deference to be afforded the EEOC's guidelines. Recognizing that "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," we held that the level of deference afforded " 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and· all those factors which give it power to persuade, if lacking power to control.' "

*Arabian American Oil Co.,* 499 U.S. 244, ——, 111 S.Ct. 1227, 1235 (quoting *Gilbert,* 429 U.S. at 141, 97 S.Ct. at 410, in turn quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). *But see Arabian American Oil Co.,* 499 U.S. at ——, 111 S.Ct. at 1236–1237 (Scalia, J. concurring in part and concurring in the judgment) ("three years ago in *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 … (1988).... [w]e said, in language quite familiar from our cases following *Chevron,* that "the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference." *Id.,* 486 U.S., at 115, 108 S.Ct., at 1671.... *Commercial Office Products* has not been overruled (or even mentioned) in today's opinion, so that the state of the law regarding deference to the EEOC is left unsettled. \* \* \* [But] [g]iven the presumption against extraterritoriality that the Court accurately describes, and the requirement that the intent to overcome it be "clearly expressed," it is in my view not reasonable to give effect to mere implications from statutory language as the EEOC has done.") (citing Cass R. Sunstein, *Law and Administration After* Chevron, 90 COLUM.L.REV. 2071, 2114 (1990)); *see also id.* at 1245 (Marshall, J., joined by Blackmun and Stevens, JJ., dissenting) (" '[T]he EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference.' " [ ] [And in this case, moreover,] the EEOC's interpretation is reinforced by the longstanding interpretation of the Department of Justice, the agency with secondary enforcement responsibility under Title VII. [ ])

(quoting *Commercial Office Products Co.*, *supra*, 486 U.S. at 115, 108 S.Ct. at 1671 (Marshall, J.); and citing *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 465–466, 106 S.Ct. 3019, 3044, 92 L.Ed.2d 344 (1986) (plurality opinion by Brennan, J.)).

Granted, the Supreme Court found *much* the matter with the EEOC's interpretation in *Arabian American Oil Co.* First, the Court concluded that the interpretation by the EEOC of the governing statute had not been *contemporaneous with its enactment.* The EEOC's position was not expressly reflected in its policy guidelines until some *24 years* after the passage of the statute. Also, the EEOC's interpretation had not been *consistent* since the statute came into effect. Further, the Court held that the EEOC's interpretation *lacked support in the "plain language" of the statute.* Thus, held that Court: "While we do not wholly discount the weight to be given to the [EEOC's] guideline, its persuasive value is limited when judged by the standards set forth in *Skidmore*." And, in light of the "*Skidmore* standards"-diminished persuasive power of the EEOC guidelines, the Court concluded that the agency's interpretation was simply incapable of *overcoming the presumptions* (1) *against* extraterritorial application and (2) *in favor of* the conclusion that a failure by Congress to expressly legislate the extraterritorial application of a statute is purposeful. *American Arabian Oil Co.*, 499 U.S. at ——, 111 S.Ct. at 1235. Still though, it is important to recognize that no Justice joined Justice Scalia's concurrence contending the EEOC's argument should fail under the *Chevron* level of scrutiny (as simply *unreasonable* ), *solely* on the latter two, presumption grounds of majority consideration. And Justice Scalia's concurrence was not necessary to the forging of a majority behind Chief Justice Rehnquist's reaffirmation that the "*Skidmore* standards"-level of scrutiny is to be applied to the Title VII interpretations reflected in EEOC guidelines.

*Arabian American Oil Co.* casts substantial doubt over upon the power of the EEOC's December, 1991 policy statement on the question whether Section 102 should be applied retroactively. It is not clear that policy statement would withstand the *Skid-* *more* standards-level of scrutiny. Good reasons tug each way on the question of whether Section 102 should be applied retroactively.

For example, with regard to one of the *Skidmore* standards—the *validity of the EEOC's reasoning* in its initial, December, 1991 policy statement—the reasoning of the EEOC is (quite colorably) questioned in the Clinton Administration Justice Department's *amicus* brief to the Supreme Court in *Landgraf.* The brief argues the Act's Section 102 damages provision *should* apply to pending cases, because it simply expands the remedies available for intentional conduct that was illegal long before the "effective date" of the 1991 Act; there is nothing unfair about requiring employers to compensate victims for injuries caused by conduct that has been illegal for almost thirty (30) years.

Relative to another of the *Skidmore* factors—consistency of agency interpretation—the December, 1991 policy statement is now inconsistent with the current (*i.e.,* "later") EEOC pronouncement on the subject. The EEOC recently withdrew, and performed an "about face" on the subject of the EEOC's December, 1991, policy statement bottoming the Fifth Circuit's *Rowe* decision. *See* EEOC Guidance to Field Offices and Regional Attorneys on Retroactivity of 1991 Civil Rights Act, Daily L.Rep. (BNA 1993 at 112 d29 (June 14, 1993)) (reprinting Chairman Tony E. Gallegos' Memorandum of June 2, 1993 ("Interim Instructions for Office of Program Operations—Application of Compensatory Damage Provision of the Civil Rights Act of 1991 to Pre–Act Conduct"), and EEOC General Counsel Donald R. Livingston's Memorandum of May 24, 1993 to All Regional Attorneys—which, in tandem reflect: (1) that on April 13, 1993, the EEOC voted to rescind its December 27, 1991 policy guidance which stated that the damages provision of the Act should not be applied "retroactively" to pre-Act (pre-November 21, 1991) conduct; (2) that during the last week of April, the EEOC joined the Clinton Administration Department of Justice's *amicus* brief submitted in the Act retroactivity cases pending before the Supreme Court—to the effect that the Act's damage provision should be applied retroactively to pending cases; (3)

a directive that EEOC field offices and regional attorneys to process and pursue Title VII and ADEA charges with a view toward obtaining evidence of damages regardless of whether the alleged violation occurred before or after the Civil Rights act of 1991's enactment date of November 21, 1991; but (4) also reflecting a directive that charges closed as of June 2, 1993 (the effective date of the Clinton Administration EEOC's processing directive) *are not to be reopened*).

With regard to the *persuasiveness* of the EEOC's December, 1991, Section 102 policy statement generally: there appear to be strong "plain statutory language" and presumption arguments cutting against that policy. To begin with, the statutory language does *not* "plainly" support the EEOC's December, 1991 policy statement. As already noted, the Act says: "[e]xcept as otherwise specifically provided, this Act and the Amendments made by this Act *shall take effect upon enactment.*" Pub.L. No. 102–166, § 402(a), 105 Stat. 1099 (emphasis added). And the Act *explicitly forecloses* retroactivity in two situations: (1) cases involving discrimination by United States companies against United States citizens living abroad (Pub.L. No. 102–166, § 109(c); and (2) certain disparate impact cases (Pub.L. No. 102–166, § 402(b)). The Fifth Circuit has found ambiguity in its reading of this language along the lines found by the Sixth Circuit: "[t]his language could be construed to mean either that the Act should be applied to any charge or case pending on or after the date of enactment, or that it should be applied only to conduct occurring after that date." *Vogel v. Cincinnati*, 959 F.2d 594, 598 (6th Cir.1992) (*quoted in Rowe v. Sullivan*, 967 F.2d 186, 192 (5th Cir.1992)). In addition, as the Clinton Administration Solicitor General has argued in the Administration's *amicus* brief to the Supreme Court in *Landgraf: Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), seems to construct a *presumption against the interpretation of the Act's Section 102 damages and jury trial provisions expressed in the EEOC's December, 1991 policy statement.* "That case, says the solicitor general, suggests a fair rule of statutory construction: When Congress is silent on the retroactivity of new statutes,

substantive provisions—such as those prohibiting conduct that was not illegal before the law's enactment—should not be applied to pending cases. But procedural and remedial provisions may be retroactive unless they would result in manifest injustice." Marcia Coyle and Cris Carmody, *Justice Department Launches Salvo in Bias Battle*, NAT'L L.J., May 17, 1993, at 5. *See also United States v. Vanella*, 619 F.2d 384, 386 (5th Cir.1980) (stating that "statutory changes that are procedural or remedial in nature apply retroactively" and holding the 1979 amendments to the Speedy Trial Act suspending imposition of the dismissal penalty (the provision in the Speedy Trial Act for the "sanction" of dismissal of a federal criminal case for failure to comply with the trial time limits set by the statute) to be procedural and, accordingly, applicable to pending cases) (citing, *inter alia, Hallowell v. Commons*, 239 U.S. 506, 508, 36 S.Ct. 202, 202, 60 L.Ed. 409 (1916) (Holmes, J.); and 2 Sutherland, Statutes & Statutory Construction § 41.04 (Sands rev. 1973)); *Fust v. Arnar–Stone Laboratories*, 736 F.2d 1098, 1100 (5th Cir. 1984) ("Statutes of limitations, *being procedural and remedial in nature*, are generally accorded retroactive effect, *unless they are unconstitutionally cast.*") (emphasis added).

Some courts called upon to determine the retroactivity question(s) presented by the Civil Rights Act of 1991 have erred by not recognizing the Supreme Court's *Arabian American Oil Co.*, EEOC "exception" to the *Chevron* doctrine of reasonableness-level scrutiny for agency interpretations of the statutes the agency administers. *See e.g., Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992). The Fifth Circuit has in fact committed this error by following the Sixth Circuit's *Vogel* in deference to the December, 1991, EEOC policy statement on purported *Chevron* grounds— so as to decide not to give retroactive effect to an "arguably substantive amendment" to the Act (the provision enlarging the time for court action-filing from 30 days to 90 days). Quoting heavily from and relying upon the Supreme Court's *Chevron* decision, and completely failing to mention *Arabian American*

*Oil Co.,* the Fifth Circuit in *Rowe* stated and held:

> On December 27, 1991, the EEOC issued a policy statement that it "will not seek damages under the Civil Rights Act of 1991 for events occurring before November 21, 1991." EEOC Notice No. 915.-002. As the Sixth Circuit has noted, "[i]n light of the ambiguity of the statute on its face and the lack of. congressional guidance, the *EEOC's decision to apply the 1991 Act prospectively appears reasonable." Vogel,* 959 F.2d at 598. *Therefore,* we will not give retroactive effect to the Act's arguably substantive amendments to Title VII.

*Rowe v. Sullivan,* 967 F.2d 186, 194 (5th Cir.1992) (emphasis added). But clearly, in light of *Arabian American Oil Co.,* an appropriate judicial inquiry into the question of whether Section 102 of the Act should be applied retroactively must move beyond a perusal of EEOC policy—into the caselaw of

**2.** The Eighth Circuit recently described the situation this way:

> It was a principle of ancient Roman civil law that legislation must be prospectively applied unless the legislature specifically decreed a retroactive application. This principle was incorporated into the English common law and carried forward through the centuries by venerable common law chroniclers such as Bracton, Coke, Blackstone, and Sir Francis Bacon.[ ] Indeed, prior to 1969, American constitutional law was more hostile to the retroactive application of statutes than English common law—many Supreme Court cases held that even legislatively mandated retroactivity may violate the Contract; Due Process, or Ex Post Facto clauses of the Constitution.[ ]

*Fray v. Omaha World Herald Co.,* 960 F.2d 1370, 1374 (8th Cir.1992) (citing Smead, *The Rule, supra,* at 775–781; 790–797).

However, as Judge Heaney pointed out in his *Fray* dissent, the traditional principle disfavoring retroactivity really reflects a concern for *fundamental fairness.* "Retroactivity" in the law has always been troubling because it is conceptually impossible to *"break" a law* that did not exist when one acted. *See* Kenneth J. Kress, *Legal Reasoning and Coherence Theories: Dworkin's Rights Thesis, Retroactivity, and the Linear Order of Decisions,* 72 CALIF L.REV. 369, 399 (1984) (hereinafter referenced as Kress, *Legal Reasoning and Coherence Theories* ).

The principle against retroactivity may indeed be conceptually confined to laws newly labeling certain conduct "law-breaking." Or, as Professor Smead put it in his influential 1936 *Minneso-*

presumptions regarding statutory retroactivity. *See generally Hicks v. Brown Group, Inc.,* 982 F.2d 295, 297 (8th Cir.1992) (en banc) (stating that with congressional intent on the retroactivity of the Act indiscernible, courts must apply the presumptions as to statutory retroactivity articulated by the Supreme Court).

### D. *Caselaw:*

### *Presumptions of Retroactive Statutory Application*

Before 1969, federal courts adhered to the "traditional rule" that statutes are generally presumed *not* to possess retroactive effect in the absence of a clear legislative intent to the contrary. *See Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); Elmer E. Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence,* 20 MINN.L.REV. 775, ·775–781 (1936) (hereinafter referenced as Smead, *(The Rule* ).[2]

*ta Law Review* article: as the American common law developed in the Nineteenth Century, the rule against retroactivity "came more and more to be limited to apply to retrospective laws which impaired vested rights in both the older common law and the broader Kentian and Storian meanings." Smead, *The Rule, supra,* at 787. Compare Sanford Levinson, *Unnatural Law,* The NEW REPUBLIC, July 19 & 26, 1993, 40–44 (reviewing Cass R. Sunstein, THE PARTIAL CONSTITUTION (1993)) (hereinafter referenced as Levinson, *Unnatural Law* ), in which Professor Levinson discusses how "Status Quo Neutrality"—the temptation to view "existing distributions of property, income, legal entitlements, wealth, so-called natural assets and preferences" as in some way the "natural order of things," and therefore protected against attempts by the state to reorder them— motivated the conservative invalidation of much ·early regulation in the late nineteenth and early twentieth centuries (*i.e.,* the *"Lochner* era"), but how "Status Quo Neutrality" was (generally, anyway) eclipsed in the modern era by "American Legal Realism"—which recognizes that "common law rules" (*i.e.,* the great patterns of the law as discerned by judges) do not merely "describe" a pre-existing set of categories, but rather, are actually human devices that *create* the very categories through which judges perceive legal and· social realities. Professor Levinson · points out that American Legal Realism can be · seen to have motivated regulation like the Civil Rights Act *of 1964* (by which; for example, Congress removed from the "traditional bundle of . property rights" the power of the restaurant owner to exclude persons from dining facilities

However, in the analytically tandem cases of *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 281–283, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969), and *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (hereinafter referenced as a collective principle, as *Bradley* or the *Bradley* line of cases), the Supreme Court apparently announced a "new rule"—*i.e.,* statute *should* be retroactively applied *unless:* (1) there is manifest legislative intent to the contrary, or (2) such an application would result in "manifest injustice."

Now, though, the Supreme Court's doctrinal winds appear to have shifted again; and yet the lower courts remain unsettled as to how to tack to stay current with Supreme Court direction.

Recently, the Supreme Court has evidenced a general reaffirmation of the "traditional rule" against retroactive statutory applications. Yet the Court has not overruled *Bradley. See e.g., Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (hereinafter referenced as a collective principle as *Bowen* or the *Bowen* line of cases). In *Bowen,* Justice Kennedy wrote for a unanimous Court: "Retroactivity is disfavored in the law. Thus, congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Bowen,* 488 U.S. at 208, 109 S.Ct. at 471. *See Johnson v. Uncle Ben's Inc.,* 965 F.2d 1363, 1374 (5th Cir.1992) (embracing the *Bowen* line with respect to an undoubtedly substantive provision of the Act, and citing with approval Justice Scalia's concurrence in *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, at 857, 110 S.Ct. 1570, at 1587 (1990)—in which Justice Scalia expressed his opinion that the *Bradley* and *Bowen* lines of cases are in "irreconcilable conflict," and that

the Supreme Court should jettison *Bradley* as soon as possible), *Pet. for Cert. filed,* 61 U.S.L.W. 3356 (Sept. 29, 1992) (Supreme Court Docket No. 92–737).

The lower courts have tried to resolve the apparently conflicting signals sent by simultaneous operation of the *Bradley* and *Bowen* lines of precedent by applying a presumption *favoring* retroactivity only when a statute is addressed to *remedies and procedures and does not otherwise alter substantive rights*— and applying the contrary presumption to all other statutes. *See e.g., Lussier v. Dugger,* 904 F.2d 661, 665 (11th Cir.1990); *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir.1985). *See also* Marcia Coyle and Cris Carmody, *Justice Department Launches Salvo in Bias Battle,* NAT'L L.J., May 17, 1993, at 5 (reporting that, in the Clinton Administration's *amicus* brief filed in the Supreme Court's retroactivity cases of next Term, the Solicitor General argues that *Bradley* and *Bowen* can be reconciled through *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), which, "says the solicitor general, suggests a fair rule of statutory construction: When Congress is silent on the retroactivity of new statutes, substantive provisions—such as those prohibiting conduct that was not illegal before the law's enactment—should not be applied to pending cases. But procedural and remedial provisions may be retroactive unless they would result in manifest injustice.").

However, the Fifth Circuit applied a different, very *"functional"* analysis in *Landgraf.* Recognizing that the distinction between "procedure" and "substance" may at times be too dimly lit to mark with great clarity (in that a change in damages or procedures may be the product of a shifting notion of the *very nature of a legal injury,* bringing in its wake significant changes in individual behavior and

---

on grounds of race)—as well as the consensus that such removal does not represent a "taking" under the Fifth Amendment requiring compensation to be extracted from the state. Indeed, Professor Levinson notes that the roots of American Legal Realism may be seen to reach back to the Thirteenth Amendment—which, confiscating "property" by abolishing slavery without compensating the slaveowners, represents one of the greatest seizures of "property" in world history.

"It is not viewed as such only because few today sympathize with the claims of the "owners" who "lost" their "property" (unlike, say, the "victims" of expropriation by the Communist states in Eastern Europe following World War II)." Sanford Levinson, *Unnatural Law,* at 41–42 (citing Pulitzer Prize–Winning Historian James M. McPherson for his recognition of the "world class"-seizure characteristic of the 13th Amendment).

the *effectuation of "substantive" rights* ), the Fifth Circuit found Section 102's damages provisions lying in the procedural/substantive "twilight zone" of retroactive/prospective statutory presumptions.[3] In short, *Landgraf* holds that even though the Act's damages and jury trial provisions might seem to fall on the "procedure," as opposed to the "substance" side of the formal distinction drawn in the Circuit's earlier, *Uncle Ben's* embrace of the Supreme Court's *Bowen* line, the "manifest injustice" standards enunciated in *Bradley* nonetheless required that these provisions not be applied "retroactively" (that is, at least not to cases pending *on appeal,* after a trial court judgment, at the time of the "effective date" of the Act).

The Fifth Circuit's *Landgraf* opinion appears to analyze the jury trial and damages provisions as free-standing, separate provisions, even though the jury trial provision is only applicable in cases in which one seeks compensatory or punitive damages. And *Landgraf's* phraseology on the *damages* provision in particular speaks in broad, even categorical terms—*i.e.*, that the Act's damages provision properly applies only to alleged *conduct occurring after the "effective date" of the Act* (because the "dramatic change in the remedial consequences of [the] rule works change in the normative reach of the rule itself," and hence a different application would wreak "manifest injustice" against employers unlawfully discriminating *before* the Act's passage). *Landgraf,* 968 F.2d at 433. Yet, *Landgraf's* analysis of the retroactivity of the *jury trial* provision in particular appears quite *appellate-review-specific.* *Id.* at 432 ("To require [Defendant] USI to *retry this case because of a statutory change enacted after the trial was completed would be an injustice and a waste of judicial resources.* We apply procedural rules to pending cases, but we do not invalidate procedures followed before the new rule was adopted.") (emphasis added) (citing *Belser v. St. Paul Fire & Marine Ins. Co.,* 965 F.2d 5,

9 (5th Cir.1992)). Moreover, the Fifth Circuit's post-*Landgraf* and *Landgraf*-interpreting cases suggest that *Landgraf's entire* Section 102 retroactivity analysis should be regarded as *appellate-review-specific.* At least, these subsequent cases are not free from confusion about the proper scope of *Landgraf's* decision(s) on Section 102 retroactivity. *See Wilson v. Belmont Homes, Inc.,* 970 F.2d 53, 56 (5th Cir.1992) ("We have already determined that *the portions of the Act that provide for jury trials and compensatory damages for claims under title VII do not apply to cases that were tried before the Act was enacted. See Landgraf v. USI Film Prods.,* 968 F.2d 427, 432 (5th Cir.1992) * * * Although generally we apply procedural rules to pending cases, we do not invalidate procedures followed before the new rules were adopted.[ ] In the instant case, the district court conducted a bench trial in a proper exercise of its power at the time. We will not force the court to retry the case with a jury based upon a law that did not then exist.") (emphasis added) (citing *Belser v. St. Paul Fire & Marine Ins. Co.,* 965 F.2d 5, 9 (5th Cir.1992)); *Wilson v. U.T. Health Center,* 973 F.2d 1263, 1267 (5th Cir.1992) ("*Wilson tried her claim to the court as required by statute before Congress permitted jury trials of these cases in the Civil Rights Act of 1991.* Our precedent precludes us from heeding Wilson's suggestion that we accord retroactive effect to the jury trial provision of the Civil Rights Act of 1991.") (citing *Landgraf,* 968 F.2d at 432–433) (emphasis added); *Valdez v. San Antonio Chamber of Commerce,* 974 F.2d 592, 595 (5th Cir.1992) ("In the present case, *the USDC had conducted a trial and entered judgment before the effective date of the Act. Therefore,* we refuse to apply retroactively [Sections 101(2)(b) and 102(c)(1) of] the Act.") (emphasis added). *But cf. Valdez, id.* at n. 2 ("In *Landgraf,* this court also refused to apply retroactively the provision of Section 102 allowing the recovery of compensatory and punitive damages. In reaching that decision, the court reasoned

---

**3.** Interestingly, the Fifth Circuit's *Landgraf* opinion does not mention the more "formal" rules announced in such Fifth Circuit precedent as *Fust v. Arnar–Stone Laboratories,* 736 F.2d 1098, 1100 (5th Cir.1984) (Politz, J.) ("Statutes of limitations, *being procedural and remedial in nature,*

are generally accorded retroactive effect, *unless they are unconstitutionally cast.*") (emphasis added); and *United States v. Vanella,* 619 F.2d 384, 386 (5th Cir.1980) (Frank Johnson, J.) ("statutory changes that are procedural or remedial in nature apply retroactively.").

that retroactively applying that provision of the Act to *conduct occurring before the effective date of the Act* would result in manifest injustice.") (emphasis added); *accord Jenkins v. City of Grenada, Miss.,* 813 F.Supp. 443, 448–450 (N.D.Miss.1993).

Further though, an *appellate-review-specific* reading of *Landgraf* is *counselled by* the Supreme Court's recent focus on the *time of the lawsuit* as the key event in terms of Section 102 retroactivity analysis. In *United States v. Burke,* the Supreme Court recognized that: "Congress' decision to permit jury trials and compensatory and punitive damages under the [1991 Civil Rights Act amended-Title VII] signals a *marked change in its conception of the injury redressable by Title VII,* and cannot be imported back into analysis of the statute as it existed *at the time of this lawsuit." Burke,* —— U.S. ——, —— n. 12, 112 S.Ct. 1867, 1874 n. 12, 119 L.Ed.2d 34 (1992) (emphasis added). Thus, in recognizing the Act-signaled "marked change" in Congress' "conception of the injury redressable by Title VII," the *Burke* Court expressed the precise concern about the "arguably substantive" ramifications of the Act's Section 102 damages and jury trial provisions so troubling to the Fifth Circuit in *Landgraf.* And yet, the *Burke* Court's concern found *legal* expression in the setting of Section 102 retroactivity sights on *the time of the lawsuit—i.e., not on the time of the alleged conduct spawning the lawsuit.*[4]

Still other caselaw offers insight into the possible legal "disconnect" between the Fifth Circuit's *Landgraf* decision and this case. In the Seventh Circuit opinion upon which the Fifth Circuit in *Landgraf* so heavily relied— *Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225, 229–230 (7th Cir.1992)—Judge Posner equivocated: "We hold that the new act is applicable only to conduct engaged in after the effective dates ... at least *if the suit had [sic] been brought before the effective date."* (emphasis added). In *Banas v. American Airlines,* 969 F.2d 477, 484–485 (7th Cir.1992), the Seventh Circuit held, relative to consideration of the Act's Section 112 (expansion of right to challenge discriminato-

ry seniority systems), that the plaintiff was "not entitled to the protection of Section 112, because her injuries occurred before the effective date of the Act *and her case was filed well before the Act was passed."* The *Banas* court proceeded to explain: "[f]or both practical and theoretical considerations, there appears to be little reason for a reviewing court to *disturb a judgment based on a law effective after the judgment is entered. Other considerations might be appropriate when the case is still pending in the trial court." Id.* (emphasis added) (citing and quoting for the propriety-of-other considerations-in-a-case-still-pending-in-the-trial-court proposition, *City Council of Waltham v. Vinciullo,* 364 Mass. 624, 307 N.E.2d 316, 319 (1974), which held: "statutes which are *remedial or procedural* should be deemed to apply retroactively to those pending cases which, on the effective date of the statute, have *not yet gone beyond the procedural stage to which the statute pertains."* (emphasis added here). And in *Mozee v. American Commercial Marine Serv. Co.,* the Seventh Circuit specifically considered the Act's subsection 102(b) and subsection 102(c) damages and jury trial provisions, and stated relative thereto: "The trial court's application of the trial procedure in effect at the time of the trial does not seem to raise the same concerns as the retroactive application of provisions defining a party's *substantive* rights and obligations.". *Mozee,* 963 F.2d 929, 939 (7th Cir.1992) (emphasis added) (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 857–858, n. 3, 110 S.Ct. 1570, 1587–1588, n. 3, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring), for the proposition that the requirement that the trial court apply the procedural law at the time of the trial is not necessarily a rule that requires retroactive application of a statute).

Finally, an important public policy, if not separation of powers concern seems to argue *against* embracing an analysis that it is always "manifestly unjust" to apply the Act's damages and jury trial, Title VII amendments to employers accused of illegally discriminating *before* the "effective date" of the

---

4. While the Fifth Circuit rendered its *Landgraf* decision approximately two months after the Su- preme Court decided *Burke, Landgraf* does not recognize *Burke.*

Act. Justice Scalia, for one, has expressed his opinion that the manifest injustice exception is just a surrogate for judges' policy preferences, "a rule of discretion, giving judges power to expand or *contract* the effect of legislative action." *Kaiser Alum. & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 857, 110 S.Ct. 1570, 1587, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) (emphasis added). At minimum, it seems, construing the manifest injustice exception to forbid the application of the Act's damages and jury trial provisions to cases *filed* after the "effective date" of the Act goes too far—and represents an improper "legislative" act by the Bench. Indeed, such a construction of "manifest injustice" appears to actually *wreak manifest injustice against Title VII plaintiffs.*

■ In determining whether retroactive application of a statute will wreak manifest injustice, courts are to consider: (a) the nature and identity of the parties, (b) the nature of the parties' rights, and (c) the nature of the impact of the change in law upon those rights. *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Belser v. St. Paul Fire & Marine Ins. Co.*, 965 F.2d 5 (5th Cir.1992). With respect to "consideration (a)"—the nature and identity of the parties: I think it obvious this is not simply a private case between individuals in which the rights of the parties are of paramount importance, as such was understood by Chief Justice Marshall in *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). Rather, consistent with the *contrary* situation envisioned in *The Schooner Peggy*, this case involves civil rights—indisputably a subject of "great national concern."[5] With respect to "consideration (b)"—the relative rights of the parties: (i) the employer certainly has a right not to be penalized for *conducting itself in accordance with current laws*—but the defendant's alleged acts of intentional race discrimination have been illegal for almost thirty (30) years; and (ii) on the other hand, Plaintiff possesses the reasonably established rights and expectations expressed through the long and well-recognized illegality of the employer's conduct at issue, and, arguably, those expressed in the apparent "effective upon enactment" promise of the damages and jury trial provisions of the Act, as well. Finally, with regard to "consideration (c)"—the nature of the impact of the change in the law upon the parties' rights: there appears nothing unfair about applying the Act's Section 102 damages and jury trial provisions to cases filed after the "effective date" of the Act. These provisions simply expand procedures and remedies available for intentional conduct illegal for a long time before the effective date of the 1991 Act, and thus there does not appear anything fundamentally or even relatively unfair about requiring employers to compensate victims for injuries suffered by vice of such conduct. *See Kress, Legal Reasoning and Coherence Theories, supra* note 2 (retroactivity in the law has traditionally been troubling because it is conceptually impossible to *"break" a law that did not exist when one acted* ); Smead, *The Rule, supra*, at 787 (as the American common law developed in the Nineteenth Century, the rule against retroactivity "came more and more to be limited to apply to retrospective laws which impaired vested rights in both the older common law and the broader Kentian and Storian meanings."); Levinson, *Unnatural Law, supra* note 2 (discussing the significance of the general eclipse of "*Lochner* era," "Status

---

5. It is also significant that in *The Schooner Peggy*, Chief Justice Marshall spoke specifically about retroactive application of intervening laws from the perspective of *the appellate court:*

It is in the general true that the province of *an appellate court* is only to enquire whether a judgment when rendered was erroneous or not. But if *subsequent to the judgment and before the decision of the appellate court*, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional ... I know of no court which can contest its

obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by retroactive operation, affect the rights of parties, but in great national concerns ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, which cannot be affirmed but in violation of law, the judgment must be set aside.

5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) (emphasis added).

Quo Neutrality" by "American Legal Realism," and how Legal Realism motivated regulation like the Civil Rights Act *of 1964* (by which, for example, Congress simply removed from the "traditional bundle of property rights" (without "taking" under the Fifth Amendment) the power of the restaurant owner to exclude persons from dining facilities on grounds of race).

In sum: in that Plaintiff *filed her lawsuit after the effective date of the 1991 Act,* it seems clear the Act's damages and jury trial provisions should apply to Plaintiff's case. The *Burke* opinion indicates a Supreme Court inclination to decide *Landgraf* in a way at least *distinguishing this case from that one: i.e.,* in contrast to the post-trial judgment, pending *appeal* situation in *Landgraf,* allowing Plaintiff Johns to pursue damages and a jury trial in this Title VII case she has *filed after the "effective date" of the Civil Rights Act of 1991* simply will not impact upon the rights and expectations of Defendant Evergreen Presbyterian Ministries, Inc. in a manner wreaking "manifest injustice" against Defendant; indeed, it appears such a "manifest injustice" construction would actually wreak manifest injustice *against Plaintiff.* Given this Court's doubts about the vitality of the Fifth Circuit's *Landgraf* (and *Rowe* ) opinion(s), compounded by doubts as to the fair and logical *applicability* of the Circuit's *Landgraf* decision to this quite dissimilar case: the ends of justice, judicial economy and simple prudence compel the Court to stay this action until the Supreme Court renders its *Landgraf* ·decision next Term.

### III. This *is* a Race Discrimination Case

Another matter need not wait. Defendant's Motion for Summary Judgment points out that Plaintiff's only Title VII cause of action properly before this Court is one for *race* discrimination. And Plaintiff does not contest Defendant's point (responding that the claim for sex discrimination in Plaintiff's Complaint was a typographical error). Defendant's Motion for Summary Judgment on this second issue should certainly be granted.

### IV. Conclusion

For the foregoing reasons, it is hereby Ordered, Adjudged and Decreed that Defendant's Motion for Summary Judgment is GRANTED IN PART and that this case is STAYED PENDING THE UNITED STATES SUPREME COURT'S DECISION IN *LANDGRAF V. USI FILM PRODUCTS* (Supreme Court Docket No. 92–757).

So Ordered.